**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| EASTERN UNIVERSITY ACADEMY CHARTER SCHOOL, | : | No. 16 EAP 2021 |
| | : | |
| | : | Appeal from the Order of |
| Appellant | : | Commonwealth Court entered on |
| | : | July 10, 2020 (reargument denied |
| | : | September 11, 2020) at 1167 CD |
| v. | : | 2019 affirming the Order entered on |
| | : | August 14, 2019 by the Charter |
| | : | School Appeal Board at 2018-04. |
| SCHOOL DISTRICT OF PHILADELPHIA, | : | |
| | : | ARGUED:  October 27, 2021 |
| Appellee | : | |

## OPINION

**JUSTICE TODD**                                    **DECIDED:  December 22, 2021**

In this appeal by allowance, we consider whether Section 1729-A(a) of the Charter School Law, 24 P.S. § 17-1729-A(a), imposes a mandatory deadline by which a school district must decide to renew or not renew a charter school's charter.  For the reasons that follow, we find that the legislature imposed no such deadline.  Thus, we affirm the order of the Commonwealth Court.

By way of background, the Charter School Law, 24 P.S. §§ 17-1701-A *et seq.*, which is subsumed in the Public School Code, was enacted by the General Assembly in 1997 to provide an alternate form of schooling, discrete from the existing public school structure, in an effort to, *inter alia*, improve pupil learning and opportunities, encourage innovative and new teaching methods, and expand educational options for parents and students within the public school system.  *Id.* § 17-1702-A.  The Charter School Law

defines "charter school" as "an independent public school established and operated under a charter from the local board of school directors and in which students are enrolled or attend," which "must be organized as a public, nonprofit corporation;" a charter "may not be granted to any for-profit entity."[1] *Id.* § 17-1703-A. An entity wishing to operate a charter school must file an application with the local board of school directors in the appropriate school district where it intends to operate a prospective charter school. *See id.* § 17-1717-A. The application must contain, *inter alia*, basic identifying information, an educational plan and structure, and financial aspects of anticipated operations. *Id.* § 17-1719-A. The Charter School Law sets forth the timeframes during which an authorizing school district must hold a public hearing and render a final decision on a prospective charter school's application, and specifies that, where a school district fails to do so within the prescribed period, the application is deemed denied and the charter applicant may appeal to the Charter School Appeal Board (the "Board"). *Id.* § 17-1717-A.

After a charter application is approved by the authorizing school district, a charter is developed and signed by the parties, which then serves as legal authorization for the establishment of the charter school and is binding upon both the charter school and the school district; an initial charter term may extend for three to five years, and the charter may be subsequently renewed for additional five-year terms upon reauthorization by the local school district. *Id.* § 17-1720-A(a). The authorizing school district is required to

---

[1] The Charter School Law likewise governs cyber charter schools, which provide learning opportunities to students predominantly via technological means, including the internet. 24 P.S. § 17-1703-A. While local school districts are tasked with authorizing and evaluating brick-and-mortar charter schools, the Pennsylvania Department of Education (the "PDE") does so for cyber charter schools. Despite the applicability of the Charter School Law's provisions to both traditional brick-and-mortar charter schools and cyber charter schools, for ease of disposition, in the context of this case, we will refer only to authorizing school districts and traditional charter schools when discussing the requirements and authorizations contained in the Charter School Law, and, more specifically, Section 1729-A(a).

"annually assess whether each charter school is meeting the goals of its charter and shall conduct a comprehensive review prior to granting a five (5) year renewal of the charter." *Id.* § 17-1728-A(a). Of particular focus in the case *sub judice*, Section 1729-A(a) sets forth a school district's power to revoke or not renew a charter: "During the term of the charter or at the end of the term of the charter, the local board of school directors may choose to revoke or not to renew the charter" if the charter school has violated the terms of the signed charter, failed to meet student performance requirements, failed to meet accepted fiscal management or audit requirements, violated provisions of the Charter School Law or any other applicable laws, or committed fraud. *Id.* § 17-1729-A(a).

Turning to the facts of the instant case, on October 3, 2006, Appellant Eastern University Academy Charter School ("Eastern"), filed an application with the School District of Philadelphia (the "School District"), Appellee herein, seeking to establish a charter school program aimed at enabling students to earn college credits at Eastern University[2] while completing their high school studies. Ultimately, in 2009, the School District granted Eastern a charter to operate a middle school and high school for students grades 7 through 12, for a term beginning on July 1, 2009, and lasting three years.

Subsequently, on June 1, 2012, the School District, acting via its School Reform Commission (the "SRC"), approved a renewal of Eastern's charter for an additional five-year term from July 1, 2012 until June 30, 2017. Eastern's 2012 renewal application incorporated its original charter application and obligated Eastern to continue its operations in accordance with the standards and goals it had represented in its original application. However, during the ensuing term of the charter, Eastern's program shifted, as its affiliation with its founding partner, Eastern University, ended, with students from

---

[2] Eastern was initially founded by Eastern University – a co-educational Christian university located in St. Davids, Pennsylvania, just outside of Philadelphia.

Eastern no longer enrolling in classes at the University after the fall semester of 2015. Eastern nevertheless submitted a second renewal application in the fall of 2016, seeking its continued operation as an "early college" program, the mission of which remained preparing students for postsecondary education and providing dual enrollment opportunities to high school students. While Eastern acknowledged in its renewal application that it was no longer affiliated with Eastern University, it indicated that its students had begun taking college courses elsewhere during the 2016-2017 school year, and that it was actively researching additional college-level opportunities for its students.

Beginning in the fall of 2016, the School District's Charter Schools Office (the "CSO") evaluated Eastern's 2016 renewal application. In the course of its evaluation, the CSO collected data, conducted 60 site visits, and assessed Eastern's performance using a renewal rubric. On June 1, 2017, the CSO published its findings in a report, ultimately recommending that Eastern's charter not be renewed. Consequently, on June 15, 2017, the SRC circulated Resolution SRC-8, a nonrenewal notice, listing 55 distinct grounds underlying the proposed nonrenewal of Eastern's charter, including subpar performance by Eastern's pupils and Eastern's failure to adhere to the stated goals of the charter program, as represented in the original charter and renewal applications. The SRC also ordered that a public hearing be conducted to address the CSO's nonrenewal recommendation. The School District appointed a hearing officer to preside over the hearing and issue a proposed report.

Following 14 days of hearings held between October 9, 2017 and December 20, 2017, the hearing officer recommended that the School District vote not to renew Eastern's charter. In his report dated March 14, 2018, the hearing officer concluded that Eastern had "violated material standards and conditions contained in its written charter, ha[d] failed to meet applicable requirements for student performance, and ha[d] violated

applicable laws from which it ha[d] not been exempted." *Eastern University Academy Charter School v. School District of Philadelphia*, 1167 C.D. 2019 (Pa. Cmwlth. filed July 10, 2020) (quoting Hearing Officer's Report, 3/14/18, at 10). Based on this report, the SRC voted not to renew Eastern's charter, by resolution dated April 26, 2018. Eastern, thereafter, appealed to the Board, arguing, *inter alia*, that the School District's failure to issue its nonrenewal decision prior to the charter's expiration date – June 30, 2017 – invalidated the nonrenewal under Section 1729-A of the Charter School Law.[3]

Upon review, the Board rejected Eastern's construction of Section 1729-A(a), concluding that the plain language of the provision does not require a school district to finish nonrenewal proceedings prior to the end of a charter's term.[4] Indeed, relying on the canons of statutory construction, the Board reasoned that, if the General Assembly had intended to require nonrenewal proceedings to conclude prior to the end of a charter school's charter term, it would have expressly imposed that requirement in the Charter School Law. However, the Board observed that, as the language of Section 1729-A(a) presently reads, the legislature imposed no deadline by which a school district must issue its decision not to renew a charter school's charter, instead, requiring only that school districts abide by the delineated due process requirements prior to opting not to renew a charter. In that vein, the Board noted that, here, the School District initiated its evaluation of Eastern's renewal application in the fall of 2016 (prior to the expiration of Eastern's charter) and circulated Resolution SRC-8 (the nonrenewal notice) on June 15, 2017 (again, before Eastern's charter had expired), but simply continued the process outlined

---

[3] Eastern also challenged the nonrenewal decision on the merits; however, the only issue currently before this Court pertains to the timeliness of the School District's nonrenewal decision.

[4] Substantively, the Board adopted the hearing officer's findings and agreed that the School District's decision not to renew Eastern's charter was supported by substantial evidence of Eastern's shortcomings.

in the Charter School Law beyond the end date of Eastern's then-current charter term. Relatedly, the Board found that Eastern's proposed construction of Section 1729-A(a) disregarded the Commonwealth Court's observation in *Community Academy of Philadelphia Charter School v. Philadelphia School District School Reform Commission*, 65 A.3d 1023 (Pa. Cmwlth. 2013) (hereinafter, "*Community Academy*"), that "an application for renewal remains pending until a later action occurs, including 'a final determination of nonrenewal.'" Board's Decision, 8/14/19, at 13 (quoting *Community Academy*, 65 A.3d at 1030-31).

The Board also highlighted that, under 24 P.S. § 17-1728-A(a), the School District was obligated to "conduct a comprehensive review prior to granting a five (5) year renewal of [Eastern's] charter." Board's Decision, 8/14/19, at 13. From the Board's perspective, "[s]uch a thorough review in this case necessarily included a review of [Eastern's] 2016-2017 school year," which, thus, prevented the School District from completing the process of evaluating Eastern's renewal application prior to the end of that school year and, likewise, rendered it nearly impossible for the School District to complete that process before Eastern's then-current charter was set to expire. *Id.* Hence, the Board affirmed the hearing officer's decision, and Eastern subsequently appealed to the Commonwealth Court, asserting, *inter alia*, that the Board erred in determining that the School District's decision not to renew its charter was timely.

In a unanimous, unpublished memorandum opinion, authored by Judge Patricia McCullough, a three-judge panel of the Commonwealth Court affirmed the Board's decision. *Eastern University Academy Charter School v. School District of Philadelphia*, 1167 C.D. 2019 (Pa. Cmwlth. filed July 10, 2020). In so doing, the court found that Section 1729-A(a) of the Charter School Law lacks any mandatory deadline by which a school district must renew or decline to renew a charter. Viewing the statutory language

as permissive, rather than mandatory, the court reasoned that Section 1729-A(a) merely provides that a school district may opt to revoke a charter during its term or may decline to renew a charter at the end of its term, and restricts the bases on which a school district may undertake such actions. Indeed, the court determined that the phrase "during the term of" references the period during which a school district may revoke a charter, while the latter phrase "at the end of" relates to "the school district's ability to decide not to 'renew' a charter at the end of its term." *Id.* at 30.

Critically, the court regarded Eastern's argument that nonrenewal of a charter must occur prior to the end date of that charter as "tantamount to asserting that a school district can never decide not to renew a charter under the Charter School Law unless the nonrenewal proceedings are completed 'by' the end, or prior to or on the expiration date of the charter school's charter." *Id.* The court rejected this construction of Section 1729-A(a), opining that the General Assembly would have explicitly provided in the Charter School Law a deadline for issuance of nonrenewal decisions if it had desired to restrict the ability of school districts to issue nonrenewal decisions beyond the date of a charter's expiration. Thus, observing that Section 1729-A(a) lacks such mandatory language, the court "decline[d] to expand the [Charter School Law] by adding to it the requirement that a school district must issue its decision not to renew a charter on a date prior to the end of the charter term." *Id.* Accordingly, the Commonwealth Court affirmed the Board's decision upholding the School District's nonrenewal of Eastern's charter.

Eastern subsequently filed a petition for allowance of appeal with our Court, and we granted review on the following issue:

> Is a school district's decision to nonrenew a charter school's charter agreement untimely where the decision has been rendered after the expiration of the charter term for which renewal was sought?

*Eastern University Academy Charter School v. School District of Philadelphia*, 373 EAL 2020 (Pa. filed Apr. 7, 2021) (order).

Presently, Eastern argues that the School District's decision not to renew its charter is invalid because the decision was not issued during or at the end of the charter's term, which expired on June 30, 2017. According to Eastern, "[t]here is no provision of the [Charter School Law] that authorizes a school district to decide to nonrenew a charter *after* the expiration of a charter term," emphasizing that, here, the School District issued its decision not to renew the relevant charter on April 26, 2018, nearly ten months after the charter's term had expired. Eastern's Brief at 12 (emphasis original). Turning to the language of Section 1729-A(a), Eastern claims that the phrase "at the end of the term of the charter" refers "to the stated end date of a charter term and does not encompass any date subsequent to the expiration of a charter term." *Id.* at 13. Eastern further suggests that its construction of the provision in this regard garners support from 24 P.S. § 17-1720-A(a), which dictates that a charter may initially be granted for a term of three to five years, and may subsequently be renewed in five-year increments, *id.*, or for a period of one year if the school district (of the first class) requires more data to assist in its disposition of a charter school's renewal application, *id.* § 17-1720-A(b)(1). In Eastern's view, Section 1720-A's provisions regarding the length of an initial charter and subsequent renewal periods demonstrate that "the term of a charter necessarily has a fixed end point," and that a contrary finding would nullify the concept of charter terms. Eastern's Brief at 13. Thus, Eastern maintains that "at the end of the term of the charter" clearly refers to "the specified end of the operative charter term" and does not encompass any time after expiration thereof. *Id.* at 13-14.

Relatedly, Eastern asserts that the Commonwealth Court's more expansive interpretation of Section 1729-A(a) runs afoul of this Court's decision in *Discovery Charter*

*School v. School District of Philadelphia*, 166 A.3d 304 (Pa. 2017) (hereinafter, "*Discovery*") (holding that the Commonwealth Court erred in creating a procedure for amending the material terms of a charter and for evaluating a request for amendment thereof, where the Charter School Law lacked the same). Eastern argues that, here, "[b]ecause the exhaustive legislative scheme of the [Charter School Law] establishes the procedures for charter renewal, those enumerated procedures must be strictly complied with and cannot be expanded upon by judicial interpretation." Eastern's Brief at 15-16 (citation omitted). According to Eastern, the lack of affirmative language in Section 1729-A(a) authorizing a school district to issue a nonrenewal after expiration of the relevant charter term demonstrates that the legislature intended to restrict the timeframe in which a school district may vote not to renew a charter. Eastern's reasoning hinges upon the phrase "at the end of," which, it submits, definitively establishes a deadline by which a school district must issue its decision not to renew a charter. Essentially, Eastern proposes that Section 1729-A(a)'s omission "of any provision authorizing a school district to retroactively nonrenew a charter means that a school district lacks the right to do so under the [Charter School Law]." *Id.* at 17.

Furthermore, Eastern contends that the School District's delayed vote not to renew the charter constituted a "failure to conform to the procedure set forth under Section 1729-A(a)," which, in turn, "extinguished the School District's right to seek termination or nonrenewal of Eastern's charter for the term that had passed." *Id.* at 18. From Eastern's perspective, the lack of an express authorization permitting a school district to revoke or not renew a charter beyond the end date of that charter's term serves as a deadline for nonrenewal, such that a school district's failure to act by that date implicates principles of waiver and effectively nullifies any nonrenewal decision issued thereafter. *See id.* (citing *Madara v. Commonwealth*, 323 A.2d 401, 403 (Pa. Cmwlth. 1974) ("We must come face

to face with the hard fact that, when the Legislature by statute calls for things to be done within stated times, they must be done so or rights fall." (citation omitted))). Eastern, thus, posits that a school district's failure to revoke or nonrenew a charter by the end of that charter's term automatically initiates a new five-year charter term; Eastern also advocates that a school district may not use reasons from the previous term to then justify revocation or nonrenewal during the new, automatically triggered term.

Emphasizing its view that the Commonwealth Court's interpretation of Section 1729-A(a) "negate[s]" the charter term requirements and, thus, "impermissibly conflict[s]" with the express language of Section 1720-A, *id.* at 19, Eastern posits that the judiciary may not rewrite the provisions of the Charter School Law in a manner which strips Section 1720-A of meaning. It criticizes the Board's suggestion that, in order to comply with Section 1729-A(a), a school district is merely obligated to *initiate* its nonrenewal evaluation prior to the expiration of a charter. While Eastern concedes that Section 1729-A(a) is arguably ambiguous as to whether it refers to the school district's final action not to renew or "more generally contemplate[s] the possibility of an interim decision prior to [the] final action to nonrenew," it maintains that, in the broader context of the Charter School Law as a whole, it becomes clear that a school district must render a *final* decision prior to the expiration of the charter term at issue. *Id.* at 20. Indeed, Eastern argues that, "[b]y establishing defined charter term lengths, the exhaustive legislative scheme of the [Charter School Law] does not permit a charter school to exist in limbo without an operative charter term (or, alternatively, for a school district to indefinitely extend a charter term)."[5] *Id.*

_____

[5] Eastern likewise submits that Section 1720-A(b)(1) bolsters its proffered construction of Section 1729-A(a). Section 17-1720-A(b)(1) provides that a school district of the first class may renew a charter for a one-year period if it "determines that there is insufficient data concerning the charter school's academic performance to adequately assess that performance and determines that an additional year of performance data would yield

Additionally, Eastern posits that requiring a school district to render its final nonrenewal decision prior to the end date of the charter in question would not hinder its ability to "conduct a comprehensive review" in accordance with Section 1728-A(a). Although Eastern admits that enforcing a stringent deadline upon school districts may limit their ability to consider matters which arise late in a charter's term, it suggests that "such a limitation would not necessarily prevent the school district from conducting a thorough review of the charter school's performance and academic data throughout several years leading up to the end of the charter term." *Id.* at 23. Moreover, Eastern suggests that school districts are not compelled to consider every potential piece of data in order to meet their review obligations. In any event, Eastern notes that Section 1720-A(a) also requires that school districts perform annual assessments of charter schools to ensure that they are meeting their stated goals, evidencing that the General Assembly intended for school districts to continually assess the standards of charter schools.

---

sufficient data to assist the governing board" in reaching its ultimate renewal decision. 24 P.S. § 17-1720-A(b)(1). Eastern claims that this provision "would serve no discernible purpose if school districts were permitted to retroactively decide upon nonrenewal after the expiration of a charter term." Eastern's Brief at 21. The School District responds that Section 1720-A(b) is applicable only in one extremely limited situation — namely, where a school district of the first class (the School District is currently the sole member of that category) requires additional data "concerning the charter school's academic performance" in the course of disposing of that charter school's request for a traditional five-year renewal. 24 P.S. § 17-1720-A(b)(1). This limited application excludes all other school districts in the Commonwealth and, moreover, does not assist the School District when it is considering not renewing a charter on any other bases for nonrenewal contained in Section 1729-A(a) beyond a charter school's failure "to meet the requirements for student performance," *id.* § 17-1729-A(a)(2), such as a charter school's failure to "meet generally accepted standards of fiscal management or audit requirements," *id.* § 17-1729-A(a)(3), or its "[v]iolation of any provision of law from which the charter school has not been exempted," *id.* § 17-1729-A(a)(5). We decline to base our interpretation of Section 1729-A(a), which is applicable to all school districts, on a perceived tension with a provision which applies to one class of school districts under extremely limited circumstances.

Noting that standardized tests are administered to students in Pennsylvania late in a school year and are not published by the PDE for several months thereafter, Eastern theorizes that the General Assembly possessed two alternative options in enacting the Charter School Law:

> 1) require a school district to act upon renewal before the expiration of a charter term, and thereby provide some degree of finality to stakeholders (including parents, students, and staff); or 2) instead permit a school district to drag the process along indefinitely in order to exhaust the consideration of data and information not available until late into or subsequent to an expiring charter term.

*Id.* at 24. In Eastern's opinion, the General Assembly opted for the former alternative by tying a school district's decision not to renew a charter to the end of that charter's expiring term. Eastern also submits that, despite the School District's claim that barring nonrenewal decisions which are issued following expiration of a charter's term would yield unreasonable results, interpretive rules mandate that courts give effect to every provision of a statutory scheme, citing 2 Pa.C.S. § 1921(a). Eastern, thus, maintains that we must adhere to the language of the Charter School Law, even if doing so leads to the unreasonable results to which the School District alludes.

Finally, Eastern argues that its construction of Section 1729-A(a) is consistent with *Community Academy*, *supra*. In Eastern's view, while, in *Community Academy*, the Commonwealth Court held that a school district's renewal decision under Section 1729-A(a) remains pending until the school district takes final action, "the court did not consider the substantive question of whether a potential defense might lie in the school district's failure to timely decide upon nonrenewal." Eastern's Brief at 27-28. Accordingly, for the

foregoing reasons, Eastern asks us to reverse the Commonwealth Court's decision upholding the School District's nonrenewal of Eastern's charter.[6]

---

[6] A group of public charter schools ("Public Charter Schools"), consisting of seven brick-and-mortar charter schools and five cyber charter schools operating in the Commonwealth, filed an *amicus* brief on behalf of Eastern. They argue, in a similar vein to Eastern, that the plain language of Section 1729-A(a) controls the outcome of this matter. More specifically, Public Charter Schools focus on the legislature's use of the word "at" in the provision, asserting that the word refers to a set point in time — namely, the end date of a charter school's charter term — rather than some more obscure, unspecified time in the future. To that end, Public Charter Schools offer that the word "at" is generally employed to indicate that an event will happen "at" a certain time, emphasizing that "at" is not interchangeable with "after." Moreover, Public Charter Schools claim that the legislature used "at the end of" in other statutes to indicate that something must be completed by a specified date. *See, e.g.*, 24 P.S. § 15-1532 (requiring teachers to provide grades for students "at the end of each term" or face loss of salary); 11 Pa.C.S. § 13607(b)(3) ("The absolute ownership of the building shall revert to the city, free of claim or charge, at the end of the term of the lease or renewal of the lease."); 42 Pa.C.S. § 1602(c) ("The members of the [Court of Judicial Discipline] shall serve for terms of four years, except that the member, rather than the successor of the member, shall continue to participate in any hearing in progress at the end of the term of the member."). According to Public Charter Schools, these examples clarify "that the intent of the General Assembly is that the phrase 'at the end of the term' is to mean at the actual end of the term, and not some other, unspecified time later." Public Charter Schools' Brief at 16-17.

Public Charter Schools also contend that the Board ignored the plain language of the statute by finding that a school district is required only to *initiate* the nonrenewal process prior to the set end date of a charter, but need not complete that process or reach a final decision. By doing so, Public Charter Schools assert, the Board acknowledged that Section 1729-A(a) indeed encompasses a deadline, while declining to find that deadline applicable to the completion of the proceedings. Relatedly, Public Charter Schools aver that a school district which "decides to begin nonrenewal proceedings does not 'choose' to nonrenew a school" within the meaning of Section 1729-A(a) because "choose" is synonymous with the word "decide." *Id.* at 19. In this vein, Public Charter Schools reason that a school district has chosen not to renew a charter only when it has taken formal action following a hearing, public comment, and an official vote.

Additionally, Public Charter Schools argue that, even if we should determine that Section 1729-A(a) is ambiguous, the consequences of the lower court's and the School District's interpretation would be unreasonable, as it would eviscerate any incentive that school districts may have had to act in a timely manner with respect to charter renewal applications. Public Charter Schools cite to several instances in which member schools have waited lengthy periods to attain disposition of their renewal applications. According to Public Charter Schools, enduring substantial waiting periods, such as the nine-year

The School District counters that the Board and the Commonwealth Court correctly concluded that Section 1729-A(a) contains no deadline by which school districts are mandated to complete nonrenewal proceedings. Indeed, the School District adopts the lower tribunals' position that Section 1729-A(a) simply authorizes school districts to revoke a charter during the charter term or to opt not to renew a charter at the end of a charter term. The School District maintains that the General Assembly would have explicitly stated that charter renewal decisions must be completed by a specific date if it had intended to promulgate such a deadline. Similarly, the School District observes that the General Assembly could have easily indicated that a charter will automatically renew at the end of a charter term in the absence of a school district's decision not to renew. To that point, the School District notes that the General Assembly included automatic renewal language elsewhere in the Charter School Law, demonstrating that it recognizes the type of language necessary to create an automated process. *Id.* at 16 (citing 24 P.S. § 17-1729.1-A(a) (delineating the process by which two or more charter schools may consolidate into a multiple charter school organization, whereby the PDE and the authorizing school district "will be deemed to have approved the consolidation" if they do not each perform their duties with respect to an application within 45 days after receipt thereof)). The School District emphasizes that the General Assembly provided no specific

period to which one member charter school was subjected, places charter schools in limbo, depriving them of the ability to make long-term decisions and damaging their ability to obtain financing, new students, and staff members. Public Charter Schools also note that, in their view, permitting school districts to issue nonrenewal decisions with no deadline would enable school districts to utilize delays in reaching decisions to their advantage by leveraging discretion over timing to garner concessions from charter schools during the renewal process. For example, Public Charter Schools claim that a school district could coerce a charter school into agreeing to an enrollment cap. They maintain that their construction of Section 1729-A(a) provides school districts with strong incentive to address renewal applications and prevents them from wielding unchecked power over charter schools.

timeframe for renewal decisions, signifying that it did not envision imposing such time limitations. In the School District's view, the language of Section 1729-A(a) is unambiguous, which is justification alone for affirming the Commonwealth Court.

Alternatively, the School District argues that, even if the statute is ambiguous, the Commonwealth Court's interpretation of the provision comports with the Charter School Law as a whole and garners support from the Statutory Construction Act. In that respect, the School District asserts that Eastern's interpretation of Section 1729-A(a) would lead to absurd and unreasonable consequences, the most prominent of which would be interfering with school districts' ability to comply with the various due process protections incumbent in the charter renewal procedure. According to the School District, it is not feasible to require a school district to complete the obligatory tasks — *i.e.*, starting and completing a comprehensive review of the charter school's data and operations; presenting the school board with a recommendation that it initiate nonrenewal proceedings; adhering to due process requirements in the Charter School Law; and, ultimately, issuing a final decision — before the subject charter's term ends. The School District explains that, in the course of creating a renewal recommendation report, its CSO reviews a vast amount of information pertaining to all aspects of a charter school's operations, noting that it is at the mercy of the PDE, the charter school itself, and numerous third parties to provide it with necessary information. The School District also highlights that it is often tasked with reviewing multiple renewal applications in a single year, as was the case during the 2016-2017 school year, when it was simultaneously evaluating 26 charter schools. Based on the sheer amount of data it reviews in determining whether to renew a charter, the School District submits that it would be nonsensical and unfair to require all aspects of the nonrenewal process to be completed prior to the end of the charter term. Moreover, the School District asserts that a stringent

deadline would deprive school districts of the ability to review data from the year or two just preceding a charter's expiration, harming both school districts and charter schools by impeding review of information which may have impacted, favorably or unfavorably, its decision.

Furthermore, the School District contends that Section 1729-A(c), which compels a reviewing school district to provide grounds for nonrenewal, give reasonable notice to the charter school, provide a public hearing, and accept comments from the public, contains no deadline by which the process must be completed. Likewise, the School District notes the lack of any time constraints on renewal decisions in Section 1729-A(f), as it permits charter schools to continue to operate while the nonrenewal process is completed and reviewed on appeal before the Board. *See* 24 P.S. § 17-1729-A(f) ("Except as [otherwise] provided . . . the charter shall remain in effect until final disposition by the appeal board."). The School District also claims that such a deadline would be unworkable, in light of the number of people and entities involved in the process, which nearly guarantees that there will be scheduling conflicts and delays attributable to the hearing officer, witnesses, charter school personnel, and school district personnel. Indeed, the School District notes that, here, it required approximately seven weeks to gather evidence and to exchange witness lists and exhibits prior to the commencement of the nonrenewal hearing; that scheduling impacts resulted in the parties holding more than a dozen days of hearings over a three-month period; and that the hearing officer sought input from the parties, both of which submitted proposed findings of fact, conclusions of law, and briefs after the transcripts from the hearings were completed. In sum, the School District avers that "the totality of the requirements in Section 1729-A(c) reflect a process that takes at least several months." School District's Brief at 24.

Critically, the School District suggests that requiring the due process obligations contained in Section 1729-A to be completed by the end of a charter's term would permit a charter school to escape an unfavorable decision by simply declining to participate in the process in a timely manner. Further, the School District maintains that implementing a strict deadline would eliminate any possibility of school districts meaningfully complying with the legislature's mandate that they complete a comprehensive review prior to nonrenewal, as significant information would remain unavailable.

Contrary to Eastern, the School District views *Discovery*, *supra*, as inapposite, stressing that, therein, we were tasked with determining whether the Charter School Law provided any statutory basis for a charter amendment process and, if not, whether the judiciary had improperly rewritten the statute by adopting such a procedure. The School District argues that, unlike in *Discovery*, the plain language of the Charter School Law addresses the process associated with a school district's decision not to renew a charter. In its view, the Commonwealth Court's interpretation of Section 1729-A(a) "was not an 'expansion' of the statute," but instead was the result of "a straightforward exercise in

statutory review and interpretation." *Id.* at 32.[7][8] In light of the foregoing, the School District asks us to uphold the Commonwealth Court's interpretation of Section 1729-A(a) and to find that the provision contains no deadline for issuance of a decision not to renew a charter school's charter.[9]

---

[7] The School District rejects *amici* Public Charter Schools' reliance upon 24 P.S. § 15-1532 in claiming that "at the end of the term" cannot encompass any action taken "after" the end of the term. The School District explains that, although teachers are required under that provision to provide grades "at the end of each term" to ensure that they receive their last month of their salaries, "the statutory language does not require the grades to be submitted on the exact last day of the term." School District's Brief at 43. Rather, the School District observes, the statute merely requires teachers to submit the grades for a particular term in time to appear on the corresponding report card, which is not issued on the exact end date of a school term, but, instead, arrives some time thereafter.

The School District likewise discounts Public Charter Schools' attempt to analogize the legislature's inclusion of "at the end of the term of the charter" in Section 1729-A(a) to its use of "at the end of the term of the lease" in Section 13607(b)(3) of the Third Class City Code and "at the end of the term" in Section 1602(c) of the Judicial Code. With respect to the former, the School District maintains that the Third Class City Code "sets a timeframe for a statutorily prescribed reversion of a property interest to occur without the need for any further process," *id.* at 44, whereas Section 1729-A includes stringent due process aspects to which school districts must adhere. Similarly, the School District asserts that Section 1602(c) of the Judicial Code contains no deadline and simply allows a member of the Court of Judicial Discipline continued participation in hearings which are already in progress at his or her term's end, endowing that member with a timeframe in which he or she continues to possess some judicial authority after the term of service ends. According to the School District, neither of these statutes indicate a deadline by which a person or entity must act.

[8] The School District submits that Public Charter Schools has raised factual issues that are beyond the scope of the record, protesting that it lacks the ability to rebut several claims made regarding charter schools which fall outside of its own authorization, including the cyber charter schools, which are authorized by the PDE. In any event, the School District faults several of the charter schools that it has authorized for delays in the renewal of their charters, claiming that those charter schools refused to sign renewal charters of their own volition, resulting in the schools remaining in status quo with no renewal decision.

[9] The Pennsylvania School Boards Association (the "PSBA") submitted an *amicus curiae* brief which largely echoes the arguments proffered by the School District. However, the PSBA emphasizes its view that the legislature intended Section 1729-A to serve as a "means of oversight, quality assurance[,] and accountability regarding a charter school's

With the parties' arguments on hand, we turn to the issue currently before us —
the statutory interpretation of "at the end of the term of the charter" within the meaning of
Section 1729-A(a) of the Charter School Law.[10]  As noted *supra*, Section 1729-A(a)
provides:

> (a) During the term of the charter or *at the end of the term of the charter*, the local board of school directors may choose to revoke or not to renew the charter based on any of the following:
>
> (1) One or more material violations of any of the conditions, standards or procedures contained in the written charter signed pursuant to section 1720-A.
>
> (2) Failure to meet the requirements for student performance set forth in 22 Pa. Code Ch. 5 (relating to curriculum) or subsequent regulations promulgated to replace 22 Pa.Code Ch. 5 or failure to meet any performance standard set forth in the written charter signed pursuant to section 1716-A.
>
> (3) Failure to meet generally accepted standards of fiscal management or audit requirements.
>
> (4) Violation of provisions of this article.

---

educational performance, fiscal management[,] and legal compliance."  PSBA's Brief at 7.  The PSBA argues that oversight of charter schools is of the utmost importance, given that the schools are funded by taxpayer dollars but governed by boards of trustees, which are not elected by the general public and have no accountability thereto.  The PSBA also highlights the legislative history underlying the enactment of the Charter School Law, including various comments by members of the General Assembly indicating their desire to ensure that charter schools remain accountable.  *See id.* at 8-9 (citing statements of Representative Cowell, Senator Mowery, Senator Schwartz, and Senator Rhoades).  In the PSBA's view, imposing a stringent deadline by which school districts must finalize renewal decisions "would weaken or defeat [the] critical accountability process, whether by forcing it to be rushed and shallow with fewer safeguards, or by forcing it to begin much earlier and thereby truncating the period of performance being evaluated."  *Id.* at 11.

[10] This presents a question of law; thus, our standard of review is *de novo* and our scope of review is plenary.  *S & H Transport, Inc. v. City of York*, 210 A.3d 1028, 1038 (Pa. 2019).

(5) Violation of any provision of law from which the charter school has not been exempted, including Federal laws and regulations governing children with disabilities.

(6) The charter school has been convicted of fraud.

24 P.S. § 17-1729-A(a) (emphasis added; footnotes omitted).[11]

Our Court has often reiterated that "our paramount goal in interpreting a statute is to 'ascertain and effectuate the intention of the General Assembly.'" *Greenwood Gaming & Ent., Inc. v. Commonwealth of Pa.*, --- A.3d ---, 2021 WL 5349226, at *6 (Pa. filed Nov. 17, 2021) (citations omitted); *see* 1 Pa.C.S. § 1921(a). Generally, the best indicator of legislative intent is a statute's plain language; thus, "[w]hen words of a statute are clear and free from ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). However, where the statutory language is not explicit, we discern the intention of the General Assembly by considering the various factors enumerated in 1 Pa.C.S. § 1921(c), including the occasion and necessity for the statute, the object to be attained by the legislation, and the consequences of a particular interpretation. Moreover, in ascertaining legislative intent, we presume that "the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." *Id.* § 1922(1). We also bear in mind the General Assembly's directive that words and phrases "shall be construed according to rules of grammar and according to their common and approved usage." *Id.* § 1903(a). Finally, "in ascertaining legislative intent, every portion of statutory language is to be read together and in conjunction with

---

[11] We reject Eastern's contention that *Discovery*, *supra*, applies, here. In that case, we held that there was nothing in the Charter School Law "to suggest that the General Assembly intended that the terms of a binding charter be disregarded in favor of a judicially-created 'amendment' procedure," 166 A.3d at 319, or to support the Commonwealth Court's conclusion that a school district's failure to act upon an amendment request equated to a denial which was automatically appealable to the Board. Here, we are merely interpreting the language of Section 1729-A(a), as written by the General Assembly, to ascertain whether it encompasses a deadline by which school districts must act.

the remaining statutory language, and construed with reference to the entire statute as a whole." *Commonwealth v. Office of Open Records*, 103 A.3d 1276, 1285 (Pa. 2014) (citation and internal quotation marks omitted).

Initially, we reject Eastern's contention that the phrase "at the end of the term of the charter" plainly imposes a deadline, requiring nonrenewal decisions to be issued before the last date of a charter term. While "at" is a preposition which is generally used, *inter alia*, "to indicate" a "position in time,"[12] the legislature's usage of the word does not clearly establish that it intended school districts to render final nonrenewal decisions by a specified date. As the School District cogently explained, the General Assembly could have easily opted to employ more definitive language if it had intended to impose such a deadline; for example, it could have utilized the word "by" instead of "at," which would have clearly intimated that it intended for a school district to issue a final decision not to renew a charter "not later than" the end of the term of the charter.[13] The language chosen by the legislature is not so definitive.[14]

Moreover, in our view, the language of Section 1729-A(a), when read in the context of the Charter School Law as a whole, strongly indicates that the General Assembly did not intend to impose a deadline by which school districts must conclude nonrenewal proceedings, nor did it intend to enact an automated renewal process, which would be a necessary corollary of a deadline. Indeed, Section 1720-A(a) confirms that the legislature intended for renewal to be attained only through "reauthorization" by the local school

---

[12] *See At*, *Merriam-Webster.com*, *available at* https://www.merriam-webster.com/dictionary/at.

[13] *See By*, *Merriam-Webster.com*, *available at* https://www.merriam-webster.com/dictionary/by.

[14] We reject Public Charter Schools' contention, *see supra* note 6, that the General Assembly's use of "at the end of" in other statutes governing subjects far removed from the Charter School Law and the matter at hand provide any guidance.

district, undermining Eastern's claim that a school district's failure to complete nonrenewal prior to the end of a charter term leads to automatic renewal for another five-year term. Section 1720-A provides, in relevant part:

> Except as otherwise provided in subsection (b), the charter shall be for a period of no less than three (3) nor more than five (5) years and may be renewed for five (5) year periods *upon reauthorization* by the local board of school directors of a school district or the appeal board.

24 P.S. § 17-1720-A(a) (emphasis added). This reauthorization mandate would be nullified if Section 1729-A(a) were read to encompass a deadline, as that would suggest a charter's term would automatically renew if a school district failed to comply with the nonrenewal deadline. In that regard, Section 1729-A(f) also demonstrates that the legislature did not contemplate an automatic renewal process or specific deadline for nonrenewal decisions, as it provides for continuity while nonrenewal decisions are under review. *See id.* § 17-1729-A(f) (mandating that, in cases of revocation or nonrenewal, a charter "shall remain in effect until final disposition by the [Board]").

By contrast, as the School District highlights, our legislature has employed express "automatic" action language and deadlines elsewhere in the Charter School Law. Section 1729.1-A, which provides that two or more charter schools may consolidate into a multiple charter school organization if their application is approved by the PDE and by each school district that authorized the creation of the separate charter schools, illustrates this point. Specifically, the General Assembly expressly included language in Section 1729.1-A under which applications for the creation of multiple charter school organizations are automatically approved if deadlines are not met by the PDE or the school districts. *See id.* § 1729.1-A(a)(1)(i) ("If [the PDE] does not approve or disapprove the proposed consolidation within forty-five (45) days after receipt of the application, [the PDE] will be deemed to have approved the consolidation."); *id.* § 1729.1-A(a)(1)(ii) ("If a local board of

school directors does not adopt a resolution under this clause approving or rejecting the proposed consolidation within forty-five (45) days after receipt of the application, the school district will be deemed to have approved the consolidation.").

Likewise, Section 1717-A(g) mandates that, in the context of initial charter applications, "failure by the local board of directors to hold a public hearing and to grant or deny the application for a charter school within the time periods specified in subsections (d), (e) and (f) shall permit the applicant for a charter to file its application as an appeal to the appeal board," which then is tasked with reviewing the application and rendering a decision to grant or deny the charter. *Id.* § 17-1717-A(g). Thus, Section 1717-A(g) imposes an "automatic denial" procedure which permits an applicant for a new charter school to appeal when faced with inaction by the authorizing school district on its application. Similarly, Section 1717-A(h) imposes a strict timeline on school boards after the Board issues decisions in appeals of revocations and nonrenewals, requiring the school boards to sign written charters which the Board has determined should be renewed or not revoked "within ten . . . days of notice of reversal of the decision of the local board of directors"; otherwise "the charter *shall be deemed to be approved* and shall be signed by the chairman of the appeal board." *Id.* § 17-1717-A(h) (emphasis added).

These examples demonstrate the General Assembly's cognizance of how to impose strict timeframes under which school districts must act to avoid automatic consequences. Section 1729-A(a) is devoid of such language. This bolsters a conclusion that, here, the legislature did not intend to impose a deadline or automatic process under Section 1729-A(a).

For these reasons, we find that, when read in concert with the Charter School Law as a whole, Section 1729-A(a) sets forth no deadline by which a school district must complete the process for declining to renew a charter school's charter for a new term.

Nevertheless, to the extent that Section 1729-A(a) may be viewed as ambiguous in this regard, we resort to the tools provided in Section 1921 of the Statutory Construction Act, and in particular the consequences of adopting the interpretation proffered by Eastern, which support this conclusion.

As noted above, in enacting the Charter School Law, our legislature generally sought to provide additional learning and educational opportunities to students, outside of the traditional public school structure. *See id.* § 17-1702-A. However, the General Assembly mandated strict oversight to "[h]old the schools established under this act accountable for meeting measurable academic standards and provide the school with a method to establish accountability systems." *Id.* § 17-1702-A(6). Authorizing school districts "shall conduct a comprehensive review prior to granting a five . . . year renewal of [a] charter." *Id.* § 17-1728-A(a). They must evaluate all aspects of charter school operations, provide notice of prospective nonrenewal to governing charter school boards, present evidence in support of their decisions and hear contrary evidence from charter schools during public hearings, take formal action to nonrenew, and provide time for public comment. *See id.* § 17-1729-A(c). Requiring school districts to complete their evaluations and render final decisions prior to the end date of the charter under review would hinder their ability to engage in comprehensive evaluations of charter schools and to comply with their due process obligations under the Charter School Law, ultimately eroding the system of accountability and oversight envisioned by our General Assembly. Under Eastern's view, the legislature has required school districts to conduct comprehensive reviews of their subject charter schools, but then simultaneously constricted their ability to do so by imposing a truncated timeline in which they must evaluate all aspects of the charter school. This dichotomy is particularly manifest,

considering that school districts may need to simultaneously review renewal requests from multiple charter entities.

Indeed, charter schools, and the public, benefit from reviewing school districts possessing data from all relevant charter years in conducting their evaluations, and, for example, the information from the final year or two of a charter's term may alert the reviewing school district of a charter's improvement, persuading the school district to renew the charter. By contrast, construing Section 1729-A(a) to impose a deadline could encourage school districts to rush their renewal decisions, without fully reviewing or evaluating charter schools, to the detriment of pupils, staff, the charter schools, and the public in general. Moreover, providing automatic renewal would run afoul of the legislature's intent to hold charter schools accountable for their failures, permitting subpar charter schools to remain in operation indefinitely.

Further, if reviewing school districts were held to a strict deadline for renewal or nonrenewal, charter schools would be incentivized to impede the review process and hinder school districts in fulfilling their statutory-mandated functions so as to evade nonrenewal decisions and attain automatic renewal of their charters.[15] Finally, school

---

[15] We reject Eastern's and Public Charter Schools' contention that our construction of Section 1729-A(a) will encourage school districts to wield the renewal process as a weapon in order to achieve concessions from charter schools. Charter schools operate under the status quo during the pendency of renewal requests. *See* 24 P.S. § 17-1729-A(f); *Community Academy*, 65 A.3d at 1031 ("[U]ntil a final determination is issued regarding an application to renew, the charter school may continue to function as if its charter were still in effect, because no formal action to non-renew has been completed."). Hence, even if a school district opts to "drag its feet" during the renewal process, the subject charter school is entitled to continue operating according to the terms of its extant charter, seemingly in no worse a position, at least temporarily, than if the renewal application had been granted outright.

Relatedly, we reject Eastern's characterization of status quo operations as "limbo." Here, the School District initiated the nonrenewal process *prior to the end date* of Eastern's charter term, but did not complete all due process requirements until after that end date.

districts which initiated, but failed to complete, the nonrenewal process prior to the end of the term of a charter would then be required to initiate and complete *revocation* proceedings to prevent a substandard charter school from automatically attaining another five-year term, essentially duplicating the process provided for in the Charter School Law for nonrenewal, resulting in an additional expenditure of taxpayer money.[16] In short, the harmful consequences of construing Section 1729-A(a) in the manner Eastern suggests convince us that the legislature did not intend to impose a deadline on nonrenewal decisions.

For these reasons, we hold that Section 1729-A(a) of the Charter School Law encompasses no deadline by which a school district must issue its decision not to renew a charter school's charter. Given our conclusion in that regard, the School District's resolution not to renew Eastern's charter was not untimely. Accordingly, we affirm the order of the Commonwealth Court affirming the Board's decision to uphold the School District's decision not to renew Eastern's charter.

Order affirmed.

---

Thus, Eastern was undoubtedly placed on notice that the School District had grave concerns about its operations and fully intended not to renew its charter.

[16] While the permissible time period and process required for revocation under Section 1729-A(a) is not at issue in this appeal, Eastern's contention that a school district's revocation of a charter may not be based upon transgressions from a prior charter term further illustrates the deleterious consequences which could result from imposing a nonrenewal deadline upon school districts. Without opining as to the accuracy of Eastern's interpretation on this aspect of Section 1729-A(a), we note that such a construction, when applied in tandem with Eastern's proffered deadline for nonrenewal decisions, would result in charter schools being automatically entitled to new five-year terms when a district failed to meet the deadline *with no recourse for school districts.* For example, if a charter school committed fraud during the course of a charter term, and the authorizing school district failed to complete the nonrenewal process prior to the expiration of the term during which the fraud occurred, the school district would be unable to revoke the charter during the automatically renewed five-year term based on that previous fraudulent conduct. We cannot conclude that this is what the General Assembly envisioned.

Chief Justice Baer and Justices Donohue, Dougherty and Wecht join the opinion.

Justice Dougherty files a concurring opinion.

Justice Wecht files a concurring opinion.

Justice Saylor files a concurring and dissenting opinion in which Justice Mundy joins.